**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| AN THAI, derivatively on behalf of LORDSTOWN MOTORS CORP., <br><br>       Plaintiff, <br>       vs. <br><br> STEPHEN S. BURNS, PHIL RICHARD SCHMIDT, JULIO C. RODRIGUEZ, ANGELA STRAND BOYDSTON, SHANE BROWN, MICHAEL FABIAN, KEITH A. FELDMAN, MICHAEL D. GATES, DAVID T. HAMAMOTO, JUDITH A. HANNAWAY, STEVEN R. HASH, MICKEY W. KOWITZ, DARREN POST, JANE REISS, ANDREW C. RICHARDSON, MARTIN J. RUCIDLO, DALE G. SPENCER, JOHN VO, and MARK A. WALSH, <br><br>       Defendants, <br><br>       and <br><br> LORDSTOWN MOTORS CORP., <br><br>       Nominal Defendant. | Case No.: _____ <br><br><br> JUDGE: _____ <br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff An Thai ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Lordstown Motors Corp. ("Lordstown" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Stephen S. Burns, Phil Richard Schmidt, Julio C. Rodriguez, Angela Strand Boydston, Shane Brown. Michael Fabian, Keith A. Feldman, Michael D. Gates, David T. Hamamoto, Judith A. Hannaway, Steven R. Hash, Mickey W. Kowitz, Darren Post, Jane Reiss, Andrew C. Richardson, Martin J. Rucidlo,

Dale G. Spencer, John Vo, and Mark A. Walsh (collectively, the "Individual Defendants," and together with Lordstown, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Lordstown, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lordstown, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Lordstown's controlling shareholder, directors, and/or officers from August 3, 2020 to March 24, 2021 (the "Relevant Period").

2.      Lordstown is an Ohio-based company that purports to be an electric vehicle startup company founded for the purpose of developing and manufacturing light duty electric trucks targeted for sale to the commercial fleet market. Lordstown's purported flagship vehicle, dubbed the "Endurance," is an all-electric full-size pickup truck.

3.      The Company was previously called DiamondPeak Holdings Corporation

2

("DiamondPeak") and was a special purpose acquisition company ("SPAC") formed strictly to raise money through an initial public offering ("IPO") for the eventual acquisition of an existing company. On March 4, 2019, DiamondPeak's IPO was completed, raising more than $250 million in gross proceeds. DiamondPeak's shares began trading on the NASDAQ stock exchange under the ticker symbol "DPHC."

4.     On August 3, 2020, in a joint press release, DiamondPeak and another company, also called Lordstown Motors Corp. ("Legacy Lordstown"), announced that they had entered into a definitive merger agreement under which Legacy Lordstown would become a wholly-owned subsidiary of the Company, which would then be renamed Lordstown (the "Merger"). The Merger was subject to a majority vote of Company shareholders. The August 3, 2020 press release stated that the transaction valued Legacy Lordstown "at an implied $1.6 billion pro forma equity value" and approximated the expected gross proceeds flowing from the transaction to be $675 million. The press release touted 27,000 pre-orders for the Endurance, representing $1.4 billion in potential revenue and indicating robust demand for the all-electric full-size pickup truck by fleet customers. The press release further stated that the Endurance was on track for commercial production in the second half of 2021.

5.     On October 8, 2020, DiamondPeak filed a proxy statement on Schedule 14A with the SEC (the "Proxy Statement") soliciting, *inter alia*, shareholders' approval for the Merger. The Proxy Statement highlighted the existence of significant demand for Endurance vehicles and the receipt of 38,000 pre-orders, primarily from fleet customers. The Proxy Statement also underscored the planned Company's ability to meet its commercial production and sales targets.

6.     On October 22, 2020, DiamondPeak shareholders, relying on the Company's representations in the Proxy Statement, approved the Merger by a majority vote. The Merger

subsequently closed on October 23, 2020.

7.      On October 26, 2020, Defendant Burns claimed that the 40,000 pre-order figure was the result of "pent-up demand" for the Endurance and emphasized that he did not think "we've even scratched the surface."

8.      In November 2020, the Company announced that the number of pre-orders for the Endurance had now reached 50,000 and assured investors that "[t]his figure does not capture interest the [C]ompany has received from organizations that are not in position to be able to place pre-orders." Burns further enticed investors in an interview on CNBC's *Mad Money*, on November 17, 2020, by claiming that the pre-orders were "very serious orders" because most of the pre-orders had been signed by the CEOs of large firms.

9.      On January 11, 2021, the Company issued a press release, announcing that it had achieved 100,000 Endurance pre-orders and that fleet customers had booked 580 units per order. In this press release, Defendant Burns stated:

> Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history . . . . Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry.

10.      On February 12, 2021, Morgan Stanley analyst Adam Jonas initiated coverage of Lordstown and publicly questioned the Company's ability to deliver on its representations as to the development and production of the hub motor technology. Specifically, Jonas stated that "following a series of channel checks on the propulsion tech, we believe investors would be exposed to significantly elevated execution risk." On this news, Lordstown's share price dropped $3.84 (or 13.34%) to close at $26.91 on February 12, 2021.

11.      On March 12, 2021, Hindenburg Research published a report entitled: "The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, and a Prototype

4

Inferno" (the "Hindenburg Report"). Among the report's allegations was that Lordstown had "no revenue and no sellable product" and that the Company "ha[d] misled investors on both its demand and production capabilities." The Hindenburg Report concluded that Lordstown's "orders are largely fictitious and used as a prop to raise capital and confer legitimacy." It also revealed that a former employee "explained how the company is experiencing delays and making 'drastic' design modifications, putting [Lordstown] an estimated 3-4 years away from production," which starkly contrasted with the Company's earlier January 11, 2021 representation that production was "on track" to begin in September 2021.  On this news, Lordstown's share price dropped $2.93 (or 16.5%) to close at $14.78 on March 12, 2021.

12.     On March 17, 2021, after the market had closed, the Company held an earnings call on which it disclosed the commencement of an SEC investigation into Lordstown regarding the allegations raised by the Hindenburg Report. This was a delayed disclosure because the SEC's investigation had actually commenced a full month earlier on February 17, 2021. On this news, Lordstown's share price dropped $2.08 (or approximately 14%) to close at $13.01 on March 18, 2021.

13.     On March 24, 2021, Hindenburg Research published additional photographs of the Endurance truck that were reportedly taken after it broke down and had to be towed during the filming of an Endurance commercial in the summer of 2020. On this news, Lordstown's share price dropped $1.21 (or approximately 10%) to close at $11.38 on March 24, 2021.

14.     On June 14, 2021, the Company reported the results of the investigation conducted by the Special Committee of its Board of Directors into the Hindenburg Report. The Board's investigation report admitted to the fact that the Company's previous statements regarding pre-orders being obtained "primarily" from commercial fleets were inaccurate. Instead:

> [M]any pre-orders were obtained from (i) fleet management companies or other end users that indicated interest in purchasing Endurance trucks . . . and (ii) so-called 'influencers' or other potential strategic partners that committed to attempt to secure pre-orders from other entities but did not intend to purchase Endurance trucks directly.

The Company further admitted that one purported purchaser of a large number of pre-orders "does not appear to have the resources to complete large purchases of trucks." Other purported purchasers "provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed." On this news, Lordstown's share price dropped $2.15 (or 18.8%) to close at $9.26 on June 14, 2021.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; (4) the Company is not and has not been "on track" to start production of Endurance in September 2021; (5) the Company misrepresented the development of its hub motor and battery technology; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them

personally liable to the Company for breaching their fiduciary duties.

17.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

18.     Moreover, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in insider sales for proceeds in excess of $28 million.

19.     In addition, the Individual Defendants violated Section 14(a) of the Exchange Act by causing the Company to issue the October 8, 2020 Proxy Statement which contained false and misleading statements and omissions of material fact.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company to multiple federal securities class actions, which together name the Lordstown's former Chairman and Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its former Director of Stamping Operations ("DSO"), its President, its Chief Production Officer ("CPO"), its Vice President of Engineering ("VPE"), the former Chairman and CEO of DiamondPeak, and four other DiamondPeak directors as defendants (the "Securities Class Actions"); the need to undertake internal investigations; the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the eleven current and former Lordstown and DiamondPeak officers' and directors' liability in the Securities Class

Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Lordstown's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

23.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District because Lordstown is headquartered in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of Lordstown common stock. Plaintiff has continuously held Lordstown common stock at all relevant times.

### Nominal Defendant Lordstown

29.     Lordstown is a Delaware corporation with its principal executive offices at 2300 Hallock Young Road, Lordstown, Ohio 44481. Lordstown's shares trade on the NASDAQ under the ticker symbol "RIDE."

### Defendant Burns

30.     Defendant Stephen S. Burns ("Burns") served as Lordstown's CEO and Chairman of the Board from the Merger until June 14, 2021, when he resigned.  He also served in these roles at Legacy Lordstown, which he founded in April 2019. According to the Company's Form 10-K filed on March 25, 2021 (the "2020 10-K"), as of March 1, 2021, Defendant Burns beneficially owned 46,351,745 shares of the Company's common stock, which represented 26.25% of the Company's outstanding shares of common stock on that date, making him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Burns owned approximately $934.5 million worth of Lordstown stock.

31.     For the fiscal year ended December 31, 2020, Defendant Burns received $269,266 in salary, which also represents his total compensation from the Company for that year.

32.     The Proxy Statement said the following of Defendant Burns, in relevant part:

Mr. Burns is Lordstown's founder and has served as a director on the board of directors of Lordstown and as Lordstown's Chief Executive Officer since inception. Mr. Burns is the founder and former Chief Executive Officer of Workhorse Group. Mr. Burns was  appointed as Chief Executive Officer, Chief Financial Officer, Treasurer and Secretary of Workhorse Group on December 28,

2009 and left Workhorse Group in February 2019. Prior to Workhorse Group, Mr. Burns founded and several start-up mobile technology services businesses.

**Defendant Schmidt**

33.  Defendant Phil Richard Schmidt ("Schmidt") served as Lordstown's CPO from October 2019 to October 2020 and has served as Lordstown's President since November 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Schmidt beneficially owned 334,148 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Schmidt owned approximately $6.7 million worth of Lordstown stock.

34.  For the fiscal year ended December 31, 2020, Defendant Schmidt received $412,305 in total compensation, including $324,265 in salary and $88,040 in option awards.

35.  During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Schmidt made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 11, 2020 | 51,900 | $20.29 | $1,053,051 |
| February 2, 2021 | 161,512 | $24.77 | $4,000,652.24 |
| February 3, 2021 | 50,000 | $27.44 | $1,372,000 |

Thus, in total, before the fraud was exposed, he sold 263,412 Company shares on inside information, for which he received approximately $6,425,703.24. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

36.  The Proxy Statement said the following of Defendant Schmidt, in relevant part:

Mr. Schmidt has served as Lordstown's Chief Production Officer since October 2019 and has over 30 years of automotive industry expertise, including experiences at Toyota and Nissan as a Manager in the company's Plant, Body and Plastics Engineering divisions; Hyundai as Senior Manager of Paint; Volkswagen as Senior Manager of Paint Engineering; and Tesla Motors as Director of Manufacturing,

where he oversaw the company's Paint, Plastics, and Coatings divisions, as well as general assembly, body, high pressure die cast and special projects. Mr. Schmidt has served as a Senior Automotive Consultant for the North American Fiat Chrysler Automotive Plants from July 2017 to July 2019. In that role, Mr. Schmidt provided training to manufacturing teams and worked to improve the Fiat Chrysler Automotive Plants' quality, productivity and cost.

**Defendant Rodriguez**

37.     Defendant Julio C. Rodriguez ("Rodriguez") served as Lordstown's CFO from September 2019 to June 14, 2021, when he resigned.

38.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rodriguez made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 4, 2021 | 9,300 | $27 | $251,100 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

39.     The Proxy Statement said the following of Defendant Rodriguez, in relevant part:

Mr. Rodriguez has served as Lordstown's Chief Financial Officer since September 2019 and has over 30 years of experience in financial and operational leadership roles within various industries, including the automotive industry. Most recently, he served in several executive roles for Workhorse Group from August 2013 to August 2019. Prior to Workhorse Group, Mr. Rodriguez served in executive roles with Genuine Parts Company ("GPC"), including Director Process Improvement for GPC corporate, and Vice President Finance & Corporate Secretary for Johnson Industries, a subsidiary of GPC. Prior to GPC, Mr. Rodriguez served as Director of International Finance for Federal Mogul, an OEM manufacturer of automotive systems. Mr. Rodriguez started his career in public accounting with Arthur Andersen and holds a Bachelor of Science degree in Accounting and Business Administration.

**Defendant Strand**

40.     Defendant Angela Strand Boydston ("Strand") has served as a Company director

11

since October 2020. On June 14, 2021, Defendant Strand was appointed Executive Chair of the Company, following Defendant Burns' resignation.

41.   For the fiscal year ended December 31, 2021, Defendant Strand is entitled to receive $232,000 in total compensation at least, including a $50,000 annual cash retainer, a $12,000 Compensation Committee Chairperson annual cash retainer, a $5,000 Nominating and Corporate Governance Committee member annual cash retainer, and an annual grant of $165,000 in restricted stock units.

42.   The Proxy Statement said the following of Defendant Strand, in relevant part:

> From 2016 to 2020, Angel Strand served as a director of Integrity Applications ("Integrity"). During her time at Integrity, Ms. Strand served as Vice Chairperson of the board of directors, as chairperson of the nominating and corporate governance and compensation committees and as a member of the audit committee. Ms. Strand was a founder and senior executive of Chanje, a joint venture between Smith Electric Vehicles and FDG Electric Vehicles Ltd. (HK: 729HK) from 2016 to 2017, and a founder of In-Charge, an electric vehicle infrastructure solutions provider. Ms. Strand is also a named inventor with seven issued patents. From 2017 to 2018, Ms. Strand served as Vice President of Workhorse Group Inc.; from 2011 to 2015, Ms. Strand served as the chief marketing officer and head of business development and government affairs for Smith Electric Vehicles. Ms. Strand has also served in various executive roles at medical device, biotech and digital health firms including Proteus Digital Health (acquired by Otsuka Pharmaceutical); Aerogen (acquired by Nektar Therapeutics, NASDAQ:NKTR), Novacept (acquired by Cytyc, NASDAQ: CYTC, now NASDAQ: HOLX) and FemRx (acquired by Johnson & Johnson, NYSE: JNJ). Currently, Ms. Strand is an advisor for various companies and serves as the Founder/Managing Director of Strand Strategy. Ms. Strand holds a B.Sc. in Communications and an MBA in Marketing from the University of Tennessee. She is well qualified to serve as a director due to her board experience and her experience in the electric vehicle industry.

**Defendant Brown**

43.   Defendant Shane Brown ("Brown") has served as Lordstown's CPO since November 2020 after serving as Lordstown's Director of Paint Operations.

44.   During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant

Brown made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 2, 2021 | 19,008 | $24.65 | $468,547.20 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

45.     Lordstown's Investor Relations site[1] said the following of Defendant Brown, in relevant part:

> Mr. Brown serves as Lordstown's Chief Production Officer. He has led Lordstown's manufacturing operation as Chief Production Officer since November 2020 after serving as Lordstown's Director of Paint Operations. Mr. Brown has 28 years of manufacturing experience in many different automotive sectors. His work history includes production, engineering, and management roles at North American Bus Inc., Honda, Hyundai, Volkswagen, Kia, and New Flyer. Shane has been involved in many plant startups during his career, including green-field ventures at Hyundai in Montgomery, AL and Volkswagen in Chattanooga, TN. He has led numerous production model launches at each stop with many production models achieving the highest IQS quality ratings bestowed by J.D. Power, including the Kia Sorento, Kia Optima, and Volkswagen Passat.

**Defendant Fabian**

46.     Defendant Michael Fabian ("Fabian") has served as Lordstown's Director of Stamping Operations since February 2020.

**Defendant Feldman**

47.     Defendant Keith A. Feldman ("Feldman") has served as a Company director since October 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Feldman beneficially owned 234,645 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Feldman owned approximately $4.7 million worth of Lordstown stock.

---

[1] https://investor.lordstownmotors.com/management/shane-brown (last visited June 21, 2021).

48.     For the fiscal year ended December 31, 2021, Defendant Feldman is entitled to receive $230,000 in total compensation, including a $50,000 annual cash retainer, a $15,000 Audit Committee Chairperson annual cash retainer, and an annual grant of restricted stock units having a value of $165,000 on the grant date based on the closing market price of the Class A common stock on such date.

49.     The Proxy Statement said the following of Defendant Feldman, in relevant part:

> Mr. Feldman served as the Chief Financial Officer and Treasurer of NorthStar Realty Europe Corp. (NYSE: NRE), a NYSE listed REIT focused on European commercial real estate properties from May 2017, through the acquisition by AXA Investment Managers- Real Assets, in September 2019. Mr. Feldman served as a managing director of Colony Capital, Inc., from January 2017 to October 2019 and served as a managing director of NorthStar Asset Management Group Inc., a predecessor company of Colony Capital, Inc. from July 2014 to January 2017, as a managing director of NorthStar Realty Finance Corp. from January 2014 to July 2014 and as a director of NorthStar Realty Finance Corp. from January 2012 to December 2013. In each of these roles, Mr. Feldman's responsibilities included capital markets, corporate finance, and investor relations. Earlier in his career, Mr. Feldman held various financial positions at NorthStar Realty Finance Corp., Goldman Sachs, J.P. Morgan Chase and KPMG LLP. Mr. Feldman received a Bachelor of Science in accounting from Binghamton University. Mr. Feldman is a CFA charterholder and a CPA. He is well qualified to serve as a director due to his experience with the operations and mangement [sic], financial reporting and auditing of public companies in addition to operational expertise.

**Defendant Gates**

50.     Defendant Michael D. Gates ("Gates") has served as a Company director since October 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Gates beneficially owned 10,101 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Gates owned approximately $ 203,000 worth of Lordstown stock.

51.     For the fiscal year ended December 31, 2021, Defendant Gates is entitled to receive $220,000  in total compensation, including a $50,000 annual cash retainer, a $5,000 Nominating

and Corporate Governance Committee member annual cash retainer, and an annual grant of restricted stock units having a value of $165,000 on the grant date based on the closing market price of the Class A common stock on such date.

52.    The Proxy Statement said the following of Defendant Gates, in relevant part:

> Mr. Gates has served as the founder and owner of Gridiron Development, a real estate construction and development firm in Mason, Ohio, since January 1994. Mr. Gates also previously founded and served as President of Broome Paving from January 1988 to January 1998, and as V.P. of Sales of Performance Site from January 1998 to January 2004. Mr. Gates received a Bachelor of Business Administration from the University of Cincinnati. Mr. Gates is well qualified to serve as a director due to his experience founding, building and managing businesses in real estate, construction and development.

**Defendant Hamamoto**

53.    Defendant David T. Hamamoto ("Hamamoto") served as DiamondPeak's Chairman and CEO from its inception until the Merger in October 2020 and has served as a Company director since October 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Hamamoto beneficially owned 4,229,135 shares of the Company's common stock, which represented 2.37% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Hamamoto owned approximately $85.3 million worth of Lordstown stock.

54.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hamamoto made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 22, 2020 | 1,000,000 | $16.38 | $16,380,000 |

His insider sale made with knowledge of material non-public information before the material

misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

55.     For the fiscal year ended December 31, 2021, Defendant Hamamoto is entitled to receive $225,000 in total compensation at least, including a $50,000 annual cash retainer, a $10,000 Nominating and Corporate Governance Committee Chairperson annual cash retainer, and an annual grant of restricted stock units of $165,000.

56.     The Proxy Statement said the following of Defendant Hamamoto, in relevant part:

> Mr. Hamamoto has served as Chairman and Chief Executive Officer of DiamondPeak from inception and is the Founder of Diamond Head Partners, LLC which he established in 2017. Previously, he served as Executive Vice Chairman of Colony NorthStar (now Colony Capital, Inc. (NYSE:CLNY)), a real estate and investment management firm, from January 2017 through January 2018. The NorthStar companies, which he founded, were sold to Colony Capital in January 2017. Prior to the sale, Mr. Hamamoto was Executive Chairman of NorthStar Asset Management Group (NYSE:NSAM) ("NSAM") since 2015, having previously served as its Chairman and Chief Executive Officer from 2014 until 2015. Mr. Hamamoto was the Chairman of the board of directors of NorthStar Realty Finance Corp. (NYSE:NRF) ("NRF"), a real estate investment trust, from 2007 to January 2017 and served as one of its directors from 2003 to January 2017. Mr. Hamamoto previously served as NRF's Chief Executive Officer from 2004 until 2015 and President from 2004 until 2011. Mr. Hamamoto was Chairman of the board of directors of NorthStar Realty Europe Corp. from 2015 to January 2017. In 1997, Mr. Hamamoto co-founded NorthStar Capital Investment Corp., the predecessor to NorthStar Realty Finance, for which he served as Co-Chief Executive Officer until 2004. Prior to NorthStar, Mr. Hamamoto was a partner and co-head of the Real Estate Principal Investment Area at Goldman, Sachs & Co. During Mr. Hamamoto's tenure at Goldman, Sachs & Co., he initiated the firm's effort to build a real estate principal investment business under the auspices of the Whitehall Funds. Mr. Hamamoto received a B.S. from Stanford University and an M.B.A. from the Wharton School of Business at the University of Pennsylvania. He is well qualified to serve as a director due to his experience as a public company chairman, CEO and director and due to his extensive investment and operational experience.

**Defendant Hannaway**

57.     Defendant Judith A. Hannaway ("Hannaway") served as a director of DiamondPeak prior to its IPO until the Merger closed on October 23, 2020.

16

58.    According to the Proxy Statement, Defendant Hannaway received, upon closing of the Merger, "88,357 founder shares from our Sponsor, which would be valued in the aggregate at approximately $5,728,184 based on the closing price of our Class A common stock of $21.61 on Nasdaq on October 7, 2020."

59.    The Proxy Statement said the following of Defendant Hannaway, in relevant part:

**Judith A. Hannaway**, one of our Directors, currently acts as a consultant to various financial institutions. Prior to this, until 2004, Ms. Hannaway was employed by Scudder Investments, a wholly owned subsidiary of Deutsche Bank Asset Management, as a Managing Director. Ms. Hannaway joined Scudder Investments in 1994 and was responsible for Special Product Development including closed-end funds, offshore funds and REIT funds. Prior to joining Scudder Investments, Ms. Hannaway was employed by Kidder Peabody as a Senior Vice President in Alternative Investment Product Development. She joined Kidder Peabody in 1980 as a Real-Estate Product Manager. Ms. Hannaway has served as an independent director of Fortress Transportation & Infrastructure LLC since 2018, and previously served as the lead independent director of NorthStar Realty Europe Corp. (NYSE: NRE) from 2015 to 2019, NorthStar Realty Finance Corp. (NYSE: NRF) from 2004 to 2017 and NorthStar Asset Management Group Inc. (NYSE: NSAM) from 2014 to 2017. Additionally Ms. Hannaway served as chairperson of the independent committee of NRE, negotiating and overseeing its sale and assimilation into AXA in 2019. Ms. Hannaway holds a Bachelor of Arts from Newton College of the Sacred Heart and a Master of Business Administration from Simmons College Graduate Program in Management. She is well qualified to serve as a director due to her extensive investment, financial and public company experience.

## Defendant Hash

60.    Defendant Steven R. Hash ("Hash") served as a director of DiamondPeak prior to its IPO until the Merger closed on October 23, 2020.

61.    According to the Proxy Statement, Defendant Hash received, upon closing of the Merger, "88,357 founder shares from our Sponsor, which would be valued in the aggregate at approximately $5,728,184 based on the closing price of our Class A common stock of $21.61 on Nasdaq on October 7, 2020."

62.    The Proxy Statement said the following of Defendant Hash, in relevant part:

**Steven R. Hash**, one of our Directors, is the former President and Chief Operating Officer of Renaissance Macro Research, LLC, an equity research and trading firm focused on macro research in the investment strategy, economics, and Washington policy sectors, which he co-founded in 2012. Between 1993 and 2012, Mr. Hash held various leadership positions with Lehman Brothers (and its successor, Barclays Capital), including Global Head of Real Estate Investment Banking from 2006 to 2012, Chief Operating Officer of Global Investment Banking from 2008 to 2011, Director of Global Equity Research from 2003 to 2006, Director of U.S. Equity Research from 1999 to 2003, and Senior Equity Research Analyst from 1993 to 1999. From 1990 to 1993, Mr. Hash held various positions with Oppenheimer & Company's Equity Research Department, including senior research analyst. He began his career in 1988 as an auditor for the accounting and consulting firm of Arthur Andersen & Co. He has served as a director of Alexandria Real Estate Equities, Inc. (NYSE: ARE) since 2013 (and is currently lead director), as a director of The Macerich Company (NYSE: MAC) since 2015 (is currently non-executive chairman) and as the lead director of The Nuveen Global Cities REIT, Inc., a non-traded REIT, since 2018. Mr. Hash received a B.A. in Business Administration from Loyola University and a M.B.A. from the Stern School of Business at New York University. He is well qualified to serve as a director due to his extensive investment, public company and financial experience.

## Defendant Kowitz

63.     Defendant Mickey W. Kowitz ("Kowitz") has served as a Company director since October 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Kowitz beneficially owned 10,060 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Kowitz owned approximately $203,000 worth of Lordstown stock.

64.     For the fiscal year ended December 31, 2021, Defendant Kowitz is entitled to receive $221,500 in total compensation at least, including a $50,000 annual cash retainer, a $6,500 Compensation Committee member annual cash retainer, and an annual grant of restricted stock units having a value of $165,000 on the grant date based on the closing market price of the Class A common stock on such date.

65.     The Proxy Statement said the following of Defendant Kowitz, in relevant part:

Mr. Kowitz has served as the President and Chief Executive Officer of

ClinMunications LLC, a leading artificial intelligence communications provider serving the largest hospitals, since November 2017. Prior to that, Mr. Kowitz was the Chief Technology Officer and a director of ClinGenuity LLC, a company that developed automation solutions for clinical trial reporting. Mr. Kowtiz has over 30 years of experience in software development and innovation of new technologies related to artificial intelligence, speech recognition, natural language processing and engineering experience. Mr. Kowitz has served as a board of director on several companies and has founded and co-founded several companies that were successfully sold to private equity groups or become public companies for over $500 million. Mr. Kowitz is well qualified to serve as a director due to his experience in software development and innovation of new technologies.

**Defendant Post**

66.     Defendant Darren Post ("Post") has served as Lordstown's VPE since October 2020 after having served as Lordstown's Chief Engineer since November 2019.

67.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Post made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 4, 2021 | 10,000 | $27.21 | $272,100 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

68.     The Proxy Statement said the following of Defendant Post, in relevant part:

Prior to joining Lordstown, Mr. Post was Chief Engineer and Vice President at Karma Automotive, a start-up OEM that designs and produces plug-in hybrid luxury cars, from January 2016 to November 2019, where he launched two range extended electric vehicle luxury cars successfully into the U.S. marketplace. Prior to Karma Automotive, he was Chief Executive Officer and Executive Vice President Product Development for ALTe Technologies, an electric vehicle powertrain start-up company focused on electric vehicle and hybrid powertrains for commercial vehicles, buses and fleets for the U.S. and Chinese markets. Mr. Post also worked 32 years at GM and Delphi Automotive in product development, manufacturing and program management leadership positions. While at GM, Mr. Post led five major new vehicle programs from concept to launch and into production. Mr. Post holds a Bachelor of Science in Industrial Engineering from

Kettering University and a Master of Science in Management from the Sloan School at Massachusetts Institute of Technology, with a concentration in Operations Management and a special certificate in Management Science.

**Defendant Reiss**

69.     Defendant Jane Reiss ("Reiss") has served as a Company director since February 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Reiss beneficially owned 83,822 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Reiss owned approximately $1.7 million worth of Lordstown stock.

70.     For the fiscal year ended December 31, 2021, Defendant Reiss is entitled to receive $225,000 in total compensation, including a $50,000 annual cash retainer, a $10,000 Audit Committee member annual cash retainer, and an annual grant of restricted stock units of $165,000. For the fiscal year ended December 31, 2020, Defendant Reiss received $150,880 in stock awards, her total compensation for that year.

71.     The Proxy Statement said the following of Defendant Reiss, in relevant part:

Ms. Reiss is a leading member of New York City's advertising and marketing industry. Recently, Ms. Reiss served as Chief Marketing Officer and Chief Brand Experience Officer of Grey, one of the world's largest global advertising networks. Prior to joining Grey, Ms. Reiss served in the Administration of Mayor Michael Bloomberg as Chief Marketing Officer of the City of New York. Ms. Reiss worked with a variety of international companies while leading marketing and partnerships at NYC & Company, the official marketing, tourism and partnership organization for the City of New York. Before joining NYC & Company, Ms. Reiss served as Managing Director & Partner at Margeotes Fertitta, where she specialized in leading retail-driven businesses. Ms. Reiss is well qualified to serve as a director due to her extensive marketing experience and varied experience in the public and private sector.

**Defendant Richardson**

72.     Defendant Andrew C. Richardson ("Richardson") served as a director of DiamondPeak prior to its IPO until the Merger closed on October 23, 2020.

73.     According to the Proxy Statement, Defendant Richardson received, upon closing of the Merger, "88,357 founder shares from our Sponsor, which would be valued in the aggregate at approximately $5,728,184 based on the closing price of our Class A common stock of $21.61 on Nasdaq on October 7, 2020."

74.     The Proxy Statement said the following of Defendant Richardson, in relevant part:

**Andrew C. Richardson**, one of our Directors, is currently non-executive Chairman of Alpine Income Property Trust, Inc. (NYSE: PINE), a REIT focused on the net lease sector, and is also chair of its audit committee. From May 2019 to August 2020 he served as the Chief Operating Officer of Waypoint Real Estate Investments, a private real estate investment firm focused on the U.S. rental housing sector. Previously, Mr. Richardson served as the Chief Financial Officer and President of Land and Development of iStar, Inc. (NYSE: STAR), a real estate investor and developer, and as Chief Financial Officer of Safehold Inc. (NYSE: SAFE), a company focused on ground lease acquisition, management and capitalization from March 2018 to May 2019. Prior to joining iStar and Safehold Inc., Mr. Richardson was the Chief Financial Officer of The Howard Hughes Corporation (NYSE: HHC) from 2011 to 2016, one of the premier master planned community and large-scale mixed use commercial developers in the U.S. Prior to HHC, from 2006 to 2011 Mr. Richardson served as the Chief Financial Officer and Treasurer of NorthStar Realty Finance Corp., a publicly traded commercial real estate finance company focused on investment in real estate loans, fixed income securities and net-leased real estate properties. Before joining NorthStar, from 2000 to 2006, Mr. Richardson was an Executive Vice President with iStar Financial Inc. Mr. Richardson also served in various capacities at Salomon Smith Barney, including Vice President in the real estate investment-banking group focused on mergers and acquisitions and raising capital for public and private companies. Early in his career, Mr. Richardson was a Certified Public Accountant with Ernst & Young LLP. He holds a B.B.A. in Business from the University of Notre Dame and an M.B.A. from the University of Chicago Booth School of Business. He is well qualified to serve as a director due to his extensive investment, financial, public company and operational experience.

**Defendant Rucidlo**

75.     Defendant Martin J. Rucidlo ("Rucidlo") has served as a Company director since October 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Rucidlo beneficially owned 12,535 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Rucidlo

owned approximately $ 252,000 worth of Lordstown stock.

76.     For the fiscal year ended December 31, 2021, Defendant Rucidlo is entitled to receive $225,000 in total compensation, including a $50,000 annual cash retainer, a $10,000 Audit Committee member annual cash retainer, and an annual grant of restricted stock units of $165,000.

77.     The Proxy Statement said the following of Defendant Rucidlo, in relevant part:

Martin J. Rucidlo has served as Xerion Advanced Battery Corp.'s ("Xerion") EVP of Operations since 2017. Prior to joining Xerion, Mr. Rucidlo worked at Workhorse Group Inc. from 2010 to 2017, serving as VP of Manufacturing and later, as President. Mr. Rucidlo also has extensive experience in technical sales and marketing management. From 1996 to 2010, Mr. Rucidlo has worked in sales and marketing management at the vice president or director level for start-ups and mid-sized corporations. Mr. Rucidlo holds a B.S.I.E. in Industrial and Business Systems Engineering from Pennsylvania State University. He is well qualified to serve as a director due to his experience in manufacturing, including in the automotive industry.

**Defendant Spencer**

78.     Defendant Dale G. Spencer ("Spencer") has served as a Company director since February 2020. According to the 2020 10-K, as of March 1, 2021, Defendant Spencer beneficially owned 83,822 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2021 was $20.16, Defendant Spencer owned approximately $1.7 million worth of Lordstown stock.

79.     For the fiscal year ended December 31, 2021, Defendant Spencer is entitled to receive $221,500 in total compensation, including a $50,000 annual cash retainer, a $6,500 Compensation Committee member annual cash retainer, and an annual grant of restricted stock units of $165,000. For the fiscal year ended December 31, 2020, Defendant Spencer received $150,880 in stock awards, his total compensation for that year.

80.     The Proxy Statement said the following of Defendant Spencer, in relevant part:

Mr. Spencer is the former Vice President of Automotive Maintenance and

Engineering at United Parcel Service (UPS). As Vice President, Mr. Spencer led one of the largest and most dynamic fleets in North America with responsibilities for fleet duty cycles, maintenance and innovation. Mr. Spencer formerly served as a technical advisor on the Board of Directors of the North American Council for Freight Efficiency. He also serves as a consultant with multiple companies throughout the automotive industry. Mr. Spencer is well qualified to serve as a director due to his extensive experience with fleet operators and consulting experience through the automative industry.

**Defendant Vo**

81.     Defendant John Vo ("Vo") has served as Lordstown's Vice President of Propulsion since February 2020.

82.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Vo made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 14, 2020 | 7,800 | $20 | $156,000 |
| December 15, 2020 | 75,500 | $20.25 | $1,528,875 |
| December 16, 2020 | 15,000 | $20.75 | $311,250 |
| February 2, 2021 | 100,000 | $25.21 | $2,521,000 |

Thus, in total, before the fraud was exposed, he sold 198,300 Company shares on inside information, for which he received approximately $4,517,125. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

83.     The Proxy Statement said the following of Defendant Vo, in relevant part:

Upon the consummation of the Business Combination, Mr. Vo will serve as Vice President of Propulsion. Mr. Vo has served as Lordstown's Director of Propulsion since February 2020 and is responsible for leading all battery and drive unit operations. Prior to joining Lordstown, Mr. Vo served as COO of Aikar Technology from January 2019 to February 2020 and CEO of Portable Power Innovations from August 2017 to December 2018. As one of the first employees of Tesla, Mr. Vo served as Director of Engineering and ultimately as Tesla's Head of Global Manufacturing from 2011 to 2017. Mr. Vo has extensive experience in the semiconductor and aerospace industries, holding positions at Honeywell

Aerospace, MiaSole and Cypress Semiconductors. Mr. Vo holds advanced engineering degrees from the University of Minnesota.

**Defendant Walsh**

84.    Defendant Mark A. Walsh ("Walsh") served as a director of DiamondPeak prior to its IPO until the Merger closed on October 23, 2020.

85.    The Proxy Statement said the following of Defendant Walsh, in relevant part:

Mark A. Walsh, one of our Directors since inception, is a partner and co-founder of the Silverpeak family of companies, an alternative investment management firm with expertise in the real estate, energy and credit sectors. He is responsible for Silverpeak's strategic initiatives and origination activities, and also serves as non-Executive Chairman of Argentic Investment Management, Silverpeak's commercial real estate lending platform. Before founding Silverpeak in 2010, Mr. Walsh headed Lehman Brothers' Global Real Estate Group and served as Global Co-Head of Lehman Brothers Real Estate Private Equity. During his 20 years at Lehman Brothers, the firm became a leading debt and equity investment platform both domestically and globally. Prior to joining Lehman Brothers, Mr. Walsh was a lawyer where he represented financial institutions in all aspects of commercial mortgage loan origination, workouts and secondary market transactions. Mr. Walsh is also a Founding Member of the Ziman Center for Real Estate at UCLA's Anderson School of Management. Mr. Walsh earned his B.A. from the College of the Holy Cross and a J.D. from Fordham Law School. He is well qualified to serve as a director due to his extensive investment and operational experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

86.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Lordstown and because of their ability to control the business and corporate affairs of Lordstown, the Individual Defendants owed Lordstown and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lordstown in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lordstown and its shareholders so as to benefit all shareholders equally.

87.    Each controlling shareholder, director, and officer of the Company owes to Lordstown and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

88.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Lordstown, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

89.     To discharge their duties, the controlling shareholder, officers, and directors of Lordstown were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Lordstown, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

91.     As controlling shareholder, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

92.     To discharge their duties, the controlling shareholder, officers, and directors of Lordstown were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of Lordstown were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Ohio, and the United States, and pursuant to Lordstown's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Lordstown conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Lordstown and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to

be made of, said reports and records;

        (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lordstown's operations would comply with all applicable laws and Lordstown's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

        (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

        (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

93.     Each of the Individual Defendants further owed to Lordstown and the shareholders the duty of loyalty requiring that each favor Lordstown's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

94.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Lordstown and were at all times acting within the course and scope of such agency.

95.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Lordstown, each of the Individual Defendants had access to adverse, non-public information about the Company.

96.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lordstown.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

97.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

98.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act, and the claims alleged in the Securities Class Actions; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

99.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Lordstown was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

100.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

101.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lordstown, and was at all times acting within the course and scope of such agency.

**LORDSTOWN'S CODE OF CONDUCT AND AUDIT COMMITTEE CHARTER**

102.    The Company's Code of Conduct states that Lordstown's general policy is "to conduct its business activities and transactions with the highest level of integrity and ethical standards and in accordance with all applicable laws." Furthermore, "[a]ll directors, officers, and employees of the Company are subject to the policies contained in this Code."

103.    The Code of Conduct provides that each employee must "[p]rovide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications made by the Company."

104.    Under the section, "Compliance with Laws, Rules and Regulations," the Code of Conduct instructs, in relevant part:

> It is the personal responsibility of each employee, officer and director to adhere to the [sic] both the spirit and the form of the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, including those relating to accounting and auditing matters and insider trading.

105.    Under the section, "Fair Dealing," the Code of Conduct states, in relevant part: "No

director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair business practice."

106. Under the section, "Protection and Proper Use of Company Assets," the Code of Conduct states, in relevant part, that "[a]ll directors, officers and employees should protect the Company's assets and ensure their efficient use."

107. Under the section, "Disclosure," the Code of Conduct states, in relevant part:

> Each director, officer, and employee, to the extent involved in the Company's disclosure process, must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting, to the extent relevant to his or her area of responsibility, so that the Company's public reports and documents filed with the SEC comply in all material respects with the applicable federal securities laws and SEC rules; and (b) to the extent appropriate within his or her area of responsibility, take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

Furthermore, each director, officer, or employee must "not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations."

108. Under the section, "Record Keeping," the Code of Conduct states that the Company "requires honest and accurate recording and reporting of information in order to make responsible business decisions."

109. The "Record Keeping" section of the Code of Conduct goes on to state:

> Employees who contribute to or prepare the Company's financial statements, public filings, submissions or communications should do so in accordance with the following guidelines:
>
> - All accounting records, as well as reports produced from those records, must

be prepared in accordance with the laws of each applicable jurisdiction.
- All records must fairly and accurately reflect the transactions or occurrences to which they relate.
- All records must fairly and accurately reflect, in reasonable detail, the Company's assets, liabilities, revenues, and expenses.
- The Company's accounting records must not contain any false or intentionally misleading entries.
- No transactions should be intentionally misclassified as to accounts, departments or accounting periods.
- All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.
- No information should be concealed from independent auditors.
- Compliance with the Company's system of internal accounting controls is required.

110. Under the section, "Reporting Violations of this Code," the Code of Conduct instructs the following, in relevant part: "The Audit Committee is responsible for applying and has the authority to interpret this Code in any particular situation. Directors, officers and employees are responsible for being aware of the corporate policies applicable to their activities and to comply with them fully."

111. The Company's Audit Committee Charter also entrusts the Individual Defendants on the Audit Committee with additional responsibilities. The Audit Committee Charter states, in relevant part:

**PURPOSE**

The purpose of the Audit Committee (the "**Audit Committee**") of the Board of Directors (the "**Board**") of Lordstown Motors Corp. (the "**Company**") is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and:

- To assist the Board in oversight of:
  - the integrity of the Company's financial statements,
  - the Company's compliance with legal and regulatory requirements,
  - the independent auditor's qualifications, independence and performance,
  - the organization and performance of the Company's internal audit function,

31

- o the Company's internal accounting and financial controls,
- o the Company's treasury and finance matters, and
- o the Company's risk management and assessment pertaining to, amongst other matters, the financial, operational, accounting and tax matters of the Company, including data privacy and security.

- To provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

- To prepare the report required to be prepared by the Audit Committee pursuant to the rules and regulations of the SEC for inclusion in the Company's annual proxy statement.

\* \* \*

The Company's management is responsible for the preparation, presentation and integrity of the Company's financial statements and for the effectiveness of internal control over financial reporting. The Company's management and the internal auditing department are responsible for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures that provide for compliance with accounting standards and applicable laws and regulations.

112.    The Audit Committee Charter also charges the Audit Committee, *inter alia*, with

the following responsibilities:

8.    <u>Earnings Press Releases and Earnings Guidance</u>. The Audit Committee shall review and discuss with management the type and presentation of information to be included in earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information) and financial information and earnings guidance provided to analysts and rating agencies.

9.    <u>Internal Controls</u>. The Audit Committee shall:

- Advise management, the internal auditing department and the independent auditor that they are expected to provide to the Audit Committee a timely analysis of significant issues and practices relating to accounting principles and policies, financial reporting and internal control over financial reporting;

- Consider any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Audit Committee by the independent auditor required by or referred to in SAS 61 (as codified by AU Section 380), as it may be modified or supplemented or

other professional standards;

- Review and discuss with management, the internal auditor (or other personnel or service providers responsible for the internal audit function), and the independent auditor the adequacy and effectiveness of the Company's internal controls over financial reporting, including any significant changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditor (or other personnel or service providers responsible for the internal audit function) or management and any special audit steps adopted in light of any such significant control deficiencies or material weaknesses and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls; and

- Inquire of the Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting

*      *      *

10.    <u>Disclosure Controls and Procedures</u>. The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

*      *      *

12.    <u>Legal and Regulatory Compliance</u>. The Audit Committee shall review and discuss with Lordstown Motors Corp.'s General Counsel (the "General Counsel") and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, and make a recommendation to the Board of Directors with respect to the disposition of any proposed waiver and review any potential ethics violations brought to the attention of the Audit Committee and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters. The Audit Committee shall discuss with the General Counsel and the independent auditor any significant legal, compliance or regulatory matters (including any correspondence, notices or inquiries with or from regulators or governmental agencies and any published reports) that may have a material effect on the Company's financial statements or accounting policies. The Audit

33

Committee shall periodically discuss with the Company's Legal Department, or outside legal counsel, as applicable, legal, compliance or regulatory matters that may have a material impact on the financial statements or the Company's business, financial statements or compliance procedures that pertain to financial, accounting or tax matters of the Company. The Audit Committee shall have direct communication with the Company's Legal Department, or outside legal counsel, as applicable, as needed.

\*     \*     \*

14.    <u>Risks</u>. The Audit Committee shall review and discuss with management and the independent auditor the Company's major enterprise risk exposures and the steps management has taken to monitor and control those exposures, including:

- the Company's guidelines and policies with respect to financial risk assessment and financial risk management pertaining to financial, accounting and tax matters;

- the Company's information technology risk management guidelines and policies, including with respect to data security and privacy; and

- the Company's other major risk exposures, including with respect to operational matters, and the steps management has taken to monitor and control such exposures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

113.    On November 13, 2018, DiamondPeak was formed as a SPAC under the laws of Delaware. With no commercial operations of its own, DiamondPeak was formed strictly to raise money through an IPO for the eventual acquisition of an existing company.

114.    On January 18, 2019, DiamondPeak filed a preliminary prospectus with the SEC in which DiamondPeak stated that it would "search for a target business with a real estate related component" and "an enterprise value of between $350 million and $2.0 billion." It also stated that "[i]f we are unable to complete our business combination within 24 months, we will redeem 100% of the public shares at a per-share price, payable in cash."

115.    On March 4, 2019, DiamondPeak's IPO was completed, raising more than $250

million in gross proceeds. DiamondPeak's shares began trading on the NASDAQ stock exchange under the ticker symbol "DPHC."

116.    Lordstown purports to be an electric vehicle startup company that was founded in 2019 by Defendant Burns, the former CEO of Workhorse Group ("Workhorse"), for the purpose of developing and manufacturing light duty electric trucks targeted for sale to the commercial fleet market. The Company's flagship vehicle, the Endurance, is a full-size electric pickup truck that is purported to be powered by an innovative hub motor system involving four electric hub motors, with each wheel having its own motor.

117.    In March 2020, Legacy Lordstown paid Workhorse $12 million dollars for the licensing rights to the intellectual property of Workhorse's W-15 light-duty electric pickup truck. Legacy Lordstown intended to use Workhorse's design as a basis for the development of its own electric pickup truck. As part of this deal, Workhorse acquired a 10% equity stake in Legacy Lordstown. According to the 2020 10-K, as of March 1, 2021, Workhorse still owned 16,478,402 shares of the Company's common stock, representing 9.33%.  This amounted to more than $332 million worth of Company common stock given the March 1, 2021 price of $20.16 per share.

118.    Defendant Burns wrote in a blog post on April 21, 2020 that Legacy Lordstown would begin delivering the Endurance to commercial fleets in January 2021, after previously stating that deliveries could be expected to begin in late 2020.

119.    On May 22, 2020, the *Detroit Free Press* published an article entitled "GM's former plant in Lordstown will return to mass vehicle production, thousands of jobs" which reported that Defendant Burns "expects to employ 4,000 to 5,000 people in the plant in the near future based on demand for electric vehicles." Defendant Burns provided a first-year projected volume of 20,000 trucks based upon initial interest, stating, "I think we'll have well, well north of

35

*the 20,000 well spoken for*. ***The demand side is super strong,*** I am starting to worry we won't be able to make them fast enough." (Emphasis added.)

120.   On June 25, 2020, Legacy Lordstown unveiled a prototype of the Endurance electric pickup truck during a live-stream event that was attended by Vice President Mike Pence. Lordstown claimed that the Endurance's hub motor design was innovative, providing an improvement to performance, efficiency, safety, and cost. According to a *TechCrunch* article published on June 25, 2020 entitled, "Lordstown debuts a $52,000 electric pickup alongside a campaigning Mike Pence," Defendant Burns was quoted as follows:

> Our battery is, of course very important in a truck this size, but the big innovation is these hub motors[.] There are only four moving parts in the drivetrain of this vehicle and those are the four wheels. Just to put that in perspective, a modern-day four-wheel-drive pickup truck has thousands of moving parts . . . and every moving part has to be lubricated and every moving part is a decrease in efficiency.

121.   Legacy Lordstown also claimed to be the only manufacturer of full-size electric pickup trucks focused exclusively on the large commercial fleet market and that it expected to be the first to come to market with the innovative hub motor design. At the time, Legacy Lordstown stated that production would commence in early 2021 and that deliveries would commence later that same year. It also claimed to have a full year's worth of pre-orders on its books.

122.   A July 31, 2020 article published at *AutoTrends.org* entitled "About the 2021 Lordstown Endurance" reported that Legacy Lordstown was targeting fleet buyers who were required "to purchase at least five trucks with a $1,000 refundable deposit each" and that Legacy Lordstown would begin manufacturing the truck in the summer of 2021.

**False and Misleading Statements**

***August 3, 2020 Press Release and Conference Call***

123.   On August 3, 2020, Legacy Lordstown and DiamondPeak issued a joint press release, announcing that they had entered into a definitive merger agreement. The press release

stated that "Lordstown unveiled the prototype of its flagship Endurance pickup truck on June 25, 2020, and to date, has received more than 27,000 pre-orders for the vehicle representing over $1.4 billion of potential revenue, primarily from commercial fleet customers."

124.    The press release included the following quote by Defendant Burns:

> We are thrilled with the opportunity to build Lordstown Motors into a top-tier electric truck company that is highly differentiated from the competition. We are uniquely positioned to be a leader in the industry, with our first vehicle, the revolutionary Lordstown Endurance. Our all-electric full-size pickup truck delivers the equivalent of 75 miles per gallon and has been systematically engineered and competitively priced specifically for the large commercial fleet market, which includes companies in manufacturing, contracting, utilities, transportation and delivery, and agriculture, among others. Since its unveiling just over a month ago, the Endurance has been met with enthusiastic support, and to date, *we have secured $1.4 billion of pre-orders.* Our platform is rooted in sustainability, and the entire Lordstown team is committed to ensuring we contribute to a healthier planet for generations to come.

(Emphasis added).

125.    Defendant Hamamoto was also quoted in the same press release as saying: "The team's vast experience and track-record in launching both traditional and electric vehicles, as well as the company's strong strategic relationships, *provides Lordstown with a unique competitive advantage and positions the company to achieve its milestone of commencing production of the Endurance in the second half of 2021.*" (Emphasis added.)

126.    On August 3, 2020, Legacy Lordstown and DiamondPeak conducted a conference call with analysts and investors, making additional positive representations about the planned Company's business and financial prospects. Defendant Hamamoto began the conference call with the following statement:

> *Lordstown has attracted a clear lane of customers in the commercial fleet segment of the market, as evidenced by its 1.4 billion dollars of pre-orders to-date*, with a product that has a significant total cost of ownership advantage over competitors in both traditional and electric trucks, supports sustainable clean energy, and has a simple design that provides a robust, safe and stable ride.

(Emphasis added).

127.    During the same call, Defendant Burns also pointed to Legacy Lordstown's pre-orders as evidence of robust demand for the Endurance, stating:

> We officially unveiled the Endurance in late-June. ***The Endurance was met with great excitement and acclaim, and we now have garnered significant demand with pre-orders totaling approximately 27,000 vehicles since inception, representing more than 1.4 billion dollars of potential revenue. We hear from many fleets who cannot wait to get their hands on the Endurance***. The electric vehicle market is expected to grow significantly the next decade, underlying our expectations of selling more than 100,000 vehicles per year by 2024.

(Emphasis added).

128.    During the August 3, 2020 conference call, Legacy Lordstown and DiamondPeak presented an investor presentation slide deck, which was subsequently filed with the SEC in DiamondPeak's Form 8-K filing.  The slides highlighted purported "Selected Pre-Order Customers" as pictured below:



129.    The August 3, 2020 slides also repeated the claim that demand for the Endurance was "***proven with pre-orders covering the first year of production***." (Emphasis added.)



130. The August 3, 2020 slides claimed that Legacy Lordstown had received approximately 27,000 pre-sales for the Endurance, "representing potential revenue sufficient to cover 2021 production and into 2022." The slides also set forth a timeline for commercial production beginning in Q3 2021.



131.    The investor presentation slide deck also included a "Financial Overview" which contained "Summary Financials" reiterating that the Company was on track to sell an estimated 2,220 units in 2021 reaping $118 million in revenues, 31,600 units in 2022 reaping $1.69 billion in revenues, 65,000 units in 2022 reaping $3.476 billion in revenues, and 107,000 units in 2024 reaping $5.776 billion in revenues.



132.    Based on these sales projections, another slide placed an "Assumed [Enterprise Value] of $965mm" on Legacy Lordstown.



133.   The above statements on August 3, 2020 were false and misleading because they failed to disclose that: (1) the purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) Legacy Lordstown was not and the Company is not "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the planned Company's business and financial prospects were materially false and misleading when made.

### August 24, 2020 Preliminary Proxy Statement

134.   On August 24, 2020, DiamondPeak filed its preliminary proxy statement on Schedule 14A with the SEC, in which DiamondPeak's Board requested that stockholders vote in favor of the Merger. The preliminary proxy statement touted Legacy Lordstown's 27,000 pre-orders from fleet operators and repeated that the Company expected full production to begin in 2021, with 2,200 vehicles produced and sold that year.

41

135.    The above statements on August 24, 2020 were false and misleading because they failed to disclose that: (1) the purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) Legacy Lordstown was not and the Company is not "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the planned Company's business and financial prospects were materially false and misleading when made.

### *September 17, 2020 Investor Presentation*

136.    On September 17, 2020, DiamondPeak and Legacy Lordstown hosted an analyst day with select Wall Street firms to give an overview of Legacy Lordstown's business and discuss historical and projected financial performance, as well as recent developments with Legacy Lordstown and the electric vehicle industry generally. During the presentation, DiamondPeak and Legacy Lordstown hosted an investor presentation, showcasing a slide deck that was subsequently filed with the SEC in DiamondPeak's Form 8-K filing on September 18, 2020.

137.    The September 17, 2020 slides were nearly identical to the August 3, 2020 slides and repeated the claim that demand for the Endurance was "***proven with pre-orders covering the first year of production.***" (Emphasis added.) The slides also highlighted purported "Selected Pre-Order Customers" such as Clean Fuels Ohio, Duke Energy, FirstEnergy, Grid-X, ServePro, Summit Petroleum Inc., and Turner Mining Group. The slides further boasted of existing pre-orders representing more than "$2.0bn+" of potential revenue that "have been achieved with minimal marketing costs."

138.    The September 17, 2020 slides also claimed that Legacy Lordstown had now received "Significant Pre-Orders" of approximately 40,000 pre-sales for the Endurance which represented "potential revenue sufficient to cover production into 2023," and set forth a timeline for commercial production beginning in Q3 2021. The slides included a "Financial Overview" which contained "Summary Financials" reiterating that the Company was on track to sell an estimated 2,200 units in 2021 for $118 million in revenues, 31,600 units in 2022 for $1.69 billion in revenues, 65,000 units in 2022 for $3.476 billion in revenues, and 107,000 units in 2024 for $5.776 billion in revenues.

139.    The above statements on September 17, 2020 were false and misleading because they failed to disclose that: (1) the purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) Legacy Lordstown was not and the Company is not "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### October 8, 2020 Proxy Statement

140.    On October 8, 2020, DiamondPeak filed the Proxy Statement on Schedule 14A with the SEC. Defendants Hamamoto, Hannaway, Hash, Richardson, and Walsh solicited the

Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

141.    The Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Burns, Strand, Feldman, Gates, Hamamoto, Kowitz, Reiss, Rucidlo, and Spencer to serve staggered terms on the Board; (2) approve the Agreement and Plan of Merger, dated August 1, 2020 (the "Merger Agreement"); (3) approve amendments to DiamondPeak's amended and restated certificate of incorporation in connection with the Merger to increase the number of authorized shares of DiamondPeak's capital stock and eliminate certain provisions relating to the Class B common stock; (4) approve, in connection with the Merger and for purposes of complying with applicable listing rules of the NASDAQ, *inter alia*, the issuance of shares of Class A common stock to Lordstown stockholders and the issuance of shares of Class A common stock to certain qualified institutional buyers and accredited investors; and (5) approve the 2020 Equity Incentive Plan (the "2020 Plan") to add an additional total number of shares of common stock that "will not exceed the sum of (x) 13,000,000 and (y) the number of shares underlying awards that were initially granted under the 2019 Plan and will be converted into awards under the Plan upon the consummation of [the Merger,]" as well as "the grant of stock options, restricted stock, restricted stock units, stock appreciation rights, and performance units and performance shares" for issuance to Company employees, directors, and/or consultants.

142.    The Proxy Statement also detailed the principal functions of the Audit Committee,

---

[2] Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

which at that time consisted of Defendants Hannaway, Hash, and Richardson. These functions included the following:

- the appointment, compensation, retention, replacement, and **oversight of the work of the independent auditors and any other independent registered public accounting firm engaged by us**;

- pre-approving all audit and permitted non-audit services to be provided by the independent auditors or any other registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;

- **reviewing and discussing with the independent auditors all relationships the auditors have with us in order to evaluate their continued independence**;

- setting clear hiring policies for employees or former employees of the independent auditors;

- setting clear policies for audit partner rotation in compliance with applicable laws and regulations;

- **obtaining and reviewing a report, at least annually, from the independent auditors describing (i) the independent auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues**;

- **reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction**; and

- **reviewing with management, the independent auditors, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies** and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

(Emphasis added.)

143. The Proxy Statement claimed that while Legacy Lordstown had only "engaged in limited marketing activities," it had already obtained pre-orders for more than "38,000 Endurance vehicles," primarily from fleet purchasers.

144. The Proxy Statement also contained a "Risk Factor" section which stated, in relevant part: "To date, Lordstown has engaged in limited marketing activities and Lordstown has no binding contracts with customers. The non-binding pre-orders that Lordstown has signed did not require customer deposits and may not be converted into binding orders or sales."

145. Additionally, under the heading entitled "Role of the Board in Risk Oversight," the Proxy Statement stated the following:

> Upon the consummation of the Business Combination, one of the key functions of the board will be informed oversight of the Company's risk management process. The board expects to administer this oversight function directly through the board as a whole, as well as through various standing committees of the board that address risks inherent in their respective areas of oversight. In particular, the board will be responsible for monitoring and assessing strategic risk exposure and the audit committee will have the responsibility to consider and discuss the Company's major financial risk exposures and the steps its management will take to monitor and control such exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also will monitor compliance with legal and regulatory requirements. The compensation committee also will assess and monitor whether the Company's compensation plans, policies and programs comply with applicable legal and regulatory requirements.

146. The October 8, 2020 Proxy Statement further stated that the Company "achieved several key milestones" to "commencing commercial production and sales," and that the Company anticipated commencing full production in 2021, "with a target of 2,200 vehicles produced and sold in the year."

147. The above statements in the Proxy Statement were false and misleading because they failed to disclose that: (1) contrary to the Proxy Statement's description of DiamondPeak's Audit Committee's responsibilities, DiamondPeak's Audit Committee was not adequately

exercising these functions, was causing or permitting DiamondPeak to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the 2020 Plan; and (3) contrary to the Proxy Statement's description regarding the risk oversight function of the Board upon closing of the Merger, the Board upon closing of the Merger would utterly fail in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties.

148.    The above statements in the Proxy Statement were false and misleading because they also failed to disclose that: (1) the proposed Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) the proposed Company was not "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

149.    As a result of the material misstatements and omissions contained in the Proxy Statement, Company shareholders: (1) elected Defendants Burns, Strand, Feldman, Gates, Hamamoto, Kowitz, Reiss, Rucidlo, and Spencer to the Board, which allowed them to breach their fiduciary duties to the Company; (2) approved the Merger Agreement based on materially false and misleading statements regarding the Company's business and financial prospects; and (3) approved the 2020 Plan, allowing the Company's Board to improperly increase their and the other Individual Defendants' unjust compensation to the detriment of the Company.

### October 23, 2020 Press Release

150.     The Merger between Legacy Lordstown and DiamondPeak closed on October 23, 2020, accompanied by a press release issued by the Company. In the press release, Defendant Burns announced: "Lordstown Motors, which unveiled the prototype of its flagship Endurance pickup truck in June 2020, remains on pace to commence commercial production in the second half of 2021 at its plant in Lordstown, Ohio."

151.     The above statements on October 23, 2020 were false and misleading because they failed to disclose that the Company is not and was not "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### November 12, 2020 Prospectus and Registration Statement

152.     On November 12, 2020, Lordstown filed its preliminary prospectus and registration statement on Form S-1 with the SEC to sell approximately 153 million shares of Lordstown Class A common stock. The registration statement was amended on November 23, 2020 and declared effective by the SEC on December 4, 2020 (the "Registration Statement"). The final prospectus was filed on December 4, 2020 (the "Prospectus"). The Registration Statement and the Prospectus stated that Lordstown had pre-orders for more than 50,000 vehicles, primarily from fleet purchasers, and claimed to have built "an operational prototype" of the Endurance. The Registration Statement also stated that Lordstown was "targeting commencement of commercial production of the Endurance and initial sales in the second half of 2021." Lordstown Motors' Form S-1 also stated that the Company "achieved several key milestones" to "commencing commercial production and sales," and that the Company anticipated commencing full production in 2021 "with a target of 2,200 vehicles produced and sold in the year."

153.    The above statements in the Registration Statement and Prospectus were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### November 16, 2020 Press Release and Reuters Article

154.    On November 16, 2020, Lordstown issued a press release announcing that it "Remains on Track to Begin Production of the Lordstown Endurance in September 2021." The press release also stated that Lordstown had received "approximately 50,000 non-binding" pre-orders from "commercial fleets for its Lordstown all-electric pickup truck, with an average order size of approximately 500 vehicles per fleet." The press release went on to say that "[t]his figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders, such as federal, state and municipal governments, and military fleets."

155.    On November 16, 2020, *Reuters* published an article entitled "Lordstown Motors says electric pickup launch 'on track' for fall 2021." The article included a picture that featured Defendants Fabian and Schmidt at the White House alongside President Donald Trump, who was "inspecting" the Endurance. The *Reuters* report stated that Lordstown "remained 'on track' to begin building electric pickup trucks next September at a former General Motors Co. plant in northeastern Ohio." The *Reuters* article further reported that "[t]he company said it had received 50,000 non-binding reservations for the new truck." At the event the *Reuters* article was reporting

on, Defendant Schmidt stated, in relevant part, that "[w]e can't wait to launch [the Endurance] this year coming." In response to President Trump asking: "[Y]ou'll make how many a year when you get it going?," Defendant Burns replied, "Well, we'll make north of 100,000 once we get going."

156.    The above statements on November 16, 2020 were false and misleading because they failed to disclose that: (1) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (2) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (3) the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### November 17, 2020 Mad Money Interview

157.    On November 17, 2020, during an interview on CNBC's *Mad Money*, Defendant Burns declared "we sell to commercial fleets. That's our first customer. And like I said, we've already got 50,000 pre-orders." Defendant Burns further claimed that most of the orders were signed by the CEOs of large firms, emphasizing the orders were "***very serious orders.***" (Emphasis added.)

158.    The above statements on November 17, 2020 were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) the Company is not and has not been "on track" to start production of Endurance in

September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### December 2, 2020 Credit Suisse Conference

159.    On December 2, 2020 at the Credit Suisse 8th Annual Global Industrials Virtual Conference, in response to the question: "How do you find these fleet buyers?" Defendant Burns explained the "pent-up demand" accruing from the fleet market and "different disciplines." Specifically, he stated:

> Yeah. Well, it's been almost all incoming. We're just starting to build out the sales team. So we've been able to do again these 50,000 pre-orders just by incoming. The pent-up demand, these fleets have watched all the electrification coming – have been hearing and coming and there's been nothing for them. So the pent-up demand, I don't know, if it always be this robust. It is very, very strong. And the 50,000 doesn't include state vehicles, municipal vehicles, police vehicles, military vehicles, it's just – that's just on the commercial side. And so we just – it's spread across all different disciplines. Our average order is about 500 vehicles per order. So it's larger fleets. And even though we do have the landscape over three trucks, it's very meaningful those cost savings, if you could say the landscaper $20,000 per vehicle over five years, that's meaningful to them.

160.    The above statements on December 2, 2020 were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### December 21, 2020 Current Report

161.    On December 21, 2020, Lordstown announced on its Form 8-K filed with the SEC that it had received 80,000 pre-orders for the Endurance to date and that the "Company remain[ed] on track to begin production of the Endurance in September 2021."

162.    The above statements on December 21, 2020 were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### January 11, 2021 Press Release

163.    On January 11, 2021, Lordstown issued a press release, announcing it had achieved a milestone of 100,000 Endurance pre-orders. In this press release, Defendant Burns stated the following:

> Receiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history[.] Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry.

The press release continued that "Lordstown is now building the first Beta Endurance vehicles" and that the Company was "on track for start of production in September of this year.

164.    The above statements on January 11, 2021 were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting

group to artificially inflate the demand for Endurance pre-orders; and (4) the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### January 28, 2021 Press Release

165.    On January 28, 2021, Lordstown issued a press release announcing that the Company was "Prepar[ing] Ohio Factory to Begin Building Betas Next Month." Defendant Burns stated that "[w]e are hard at work in the factory preparing to begin Beta builds in the coming weeks," and that "[w]ith this step on the horizon, we remain on track to meet our September start-of-production timeline while continuing to see indicators of strong demand for an all-wheel drive, full-size electric pickup truck with 250 miles of range from commercial, government and military fleets."

166.    The above statements on January 28, 2021 were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; and (4) the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### February 17, 2021 Press Release

167.    On February 17, 2021, Lordstown issued a press release announcing that it had registered its Endurance Beta skateboard in the 2021 SCORE International San Felipe 250, part of

the SCORE World Desert Championship race series. In the press release, Lordstown claimed that "[a]fter successful prototype and Alpha builds, Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year."

168.    The above statement on February 17, 2021 were false and misleading because they failed to disclose that the Company is not and has not been "on track" to start production of Endurance in September 2021. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### *February 23, 2021 Yahoo! Finance Live Interview*

169.    On February 23, 2021, in an interview with *Yahoo! Finance Live*, Defendant Burns stated that Lordstown's "initial foray is into fleets, and we have pre-sold 100,000 of these vehicles to various fleets across America – really a big appetite." He continued by saying, "[y]ou've got a fleet using a 17-mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon. There is a lot of demand and excitement about it." The article further provided that "Burns said production for the Endurance will begin in September."

170.    The above statements on February 23, 2021 were false and misleading because they failed to disclose that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; and (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

### **The Truth Emerges**

### *March 12, 2021 Hindenburg Research Report*

171.    On March 12, 2021, before the markets opened, Hindenburg Research published a report titled: "The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, and a Prototype Inferno." Hindenburg Research summarized the findings set forth in the detailed Hindenburg Report as follows:

- Lordstown is an electric vehicle SPAC with no revenue and no sellable product, which we believe has misled investors on both its demand and production capabilities.

- The company has consistently pointed to its book of 100,000 pre-orders as proof of deep demand for its proposed EV truck. Our conversations with former employees, business partners and an extensive document review show that *the company's orders are largely fictitious and used as a prop to raise capital and confer legitimacy*.

- *For example, Lordstown recently announced a 14,000-truck deal from E Squared Energy, supposedly representing $735 million in sales. E Squared is based out of a small residential apartment in Texas that doesn't operate a vehicle fleet.*

- *Another 1,000-truck, $52.5 million order comes from a 2-person startup that operates out of a Regus virtual office with a mailing address at a UPS Store. We spoke with the owner who acknowledged it won't actually order any vehicles,* instead describing the "pre-order" as a mere marketing relationship.

- Yet another firm that is supposedly set to buy 500 trucks from Lordstown told us: "…The letters of interest are non-binding. It's not like you'd obligate yourself to a pre-order or that you would contractually bind yourself to buying this truck. That's not what they are."

- *Lordstown CEO Steve Burns has called these arrangements "very serious orders". The actual customer agreements, which we present for the first time today, require no deposit and are non-binding.* Many of the supposed customers do not operate fleets nor do many have the means to actually make the stated purchases.

- Former employees and litigation records reveal that in order to raise capital and confer credibility, Steve Burns began paying consultants for every truck pre-order as early as 2016 while he was serving as CEO at Workhorse.

- Later, heading into Lordstown's eventual go-public transaction in 2020*, a small consulting group called Climb2Glory was paid to generate pre-*

***orders. Climb2Glory openly described the purpose behind the pre-order game: "the faster the pre-orders arrived, the greater investors' confidence would be in the company and the faster funds would flow in."***

- One company rep that committed to buy 40 trucks through Climb2Glory told us: "…I'm not committed to anything, not to buying a single vehicle. I committed to consider buying vehicles. I'd have a lot of questions before I commit to anything."

- Others had similar remarks. "The commitment of that size (15) is totally impossible," a representative for the City of Ravenna told us about its pre-order. We document numerous other "customers" that disclaim any intent to actually purchase vehicles.

- Multiple former senior employees who have worked with Lordstown Founder & CEO Steve Burns openly described him as a "con man", or a "PT Barnum" figure. One senior employee told us that, while working with Steve for a couple of years, they saw more questionable and unethical business practices than they had seen in their entire career.

- Despite being allowed to resign from Workhorse, former senior employees described how Burns was pushed out of his old company by the board for wasting R&D money and missing promised deadlines. He then launched Lordstown months later.

- ***Despite claims that Lordstown will be producing vehicles by September, a former employee explained how the company is experiencing delays and making "drastic" design modifications, putting them an estimated 3-4 years away from production.*** For example, in mid-January the company "totally switched from a plastic exterior to aluminum," we were told.

- Despite claims that battery packs would be manufactured in-house, we were told that the equipment is months away from arriving, let alone being put into a production environment. In the meantime, we were told that battery packs are being put together by hand.

- Former employees also shared that the company has completed none of its needed testing or validation, including cold weather testing, durability testing, and Federal Motor Vehicle Safety Standards (FMVSS) testing required by the NHTSA.

- ***In January 2021, Lordstown's first street road test resulted in the vehicle bursting into flames 10 minutes into the test drive.*** We share copies of the 911 call and a police report we received through FOIA requests.

- Lordstown only went public in October 2020, but in that brief time,

> executives and directors have unloaded ~$28 million in stock. We think it
> bodes poorly when executives unload stock in a company with no actual
> product that claims to be on the cusp of mass-production.

(Emphasis added.)

172.    The Hindenburg Report further revealed that "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles." After conversing with former Lordstown employees and business partners and conducting an extensive document review, Hindenburg Research stated, "CEO Steven Burns sought to book orders, regardless of quality, purely as a tool to raise capital and confer legitimacy." In Defendant Burns' effort to drum up purported demand for the Endurance, the report stated that "[Burns] paid for customers to book valueless, non-binding pre-orders."

173.    Hindenburg Research also spoke to a former sales representative for the Lordstown Endurance, who was quoted as saying the following regarding the purported pre-orders:

> You're right to have some apprehension. ***I think the way it's being communicated especially to the media is probably not accurate.*** Everywhere I read is pre-orders, pre-orders, pre-orders. ***There's no such thing as a preorder. What they're doing is getting letters of intent and there is no commitment whatsoever. I could commit to 100,000 pre-orders or reservations but I have no commitment, no financial commitment,*** no nothing I hope they can get all 100,000 of them but I think that's extraordinarily unlikely.

(Some emphasis added.)

174.    In support of its findings, the Hindenburg Report cited several examples of "fake pre-orders" from customers that did not operate a commercial fleet and/or did not have the financial means to purchase the trucks. For example, the Hindenburg Report drew attention to a $735 million, 14,000 truck order (representing approximately 18% of the Company's pre-orders at the time) from a two-employee, non-registered corporation apparently operating out of an individual's studio apartment, and a $52.5 million, 1,000-truck order (representing approximately

13% of the Company's total order book) from a company that had a UPS Store mailing address with neither a fleet of its own nor a plan to actually purchase the trucks.

175.     The Hindenburg Report further explained Defendant Burns' desperation to increase the number of Endurance pre-orders as he eyed the capital raise on the horizon in early 2020. To accomplish this, Lordstown hired Climb2Glory, a small consulting firm, and paid Climb2Glory $30 to $50 for each Endurance pre-order it could obtain. The Hindenburg Report further noted that "***Climb2Glory boasts on its own website how it was key in helping Lordstown generate pre-orders faster in order to use the orders as a capital raising tool.***" (Emphasis added.) According to the Climb2Glory's website, "the more pre-orders achieved, the greater the confidence levels of prospective borrowers."

176.     Hindenburg Research also conducted a phone interview with Climb2Glory's managing partner, Pat Mangin, who was quoted as saying the following about the business arrangement between Climb2Glory and the Company: "Because of the letters of intent from Climb2Glory and some marketing, Diamond Group came to the table and they did the reverse merger. So our role was to help influence and acquire interest that would lead to investment. That was Climb2Glory's role." Pat Mangin further elaborated that though Climb2Glory initially paid in "contract dollars," that later they were compensated with an ownership share in Lordstown, stating: "We did get a significant amount of shares in the deal so what we do now is we still leverage our network."

177.     Hindenburg Research described other "pre-orders" that "appear similarly meaningless," including with First Energy, Momentum Groups, Summit Petroleum Inc., Mike Albert Fleet Solutions, Grid-X, and the City of Ravenna.

178.    The Hindenburg Report also described how the Endurance burst into flames during its first road test. After obtaining copies of the 911 call and a police report via FOIA requests, the Hindenburg Report revealed that the police report provided that "the vehicle was a 2021 Lordstown Endurance that had cleared testing inside of the facility" and that during "the first road test for the Endurance," the vehicle had been driven "for about ten minutes before it caught on fire."

179.    The Hindenburg Report stated that Lordstown announced just two weeks after this fire, that the Company would commence building beta trucks in a month. Belatedly, about a month later, Lordstown finally acknowledged the occurrent of "an event," stating that "we do not generally comment on individual testing conditions."

180.    The Hindenburg Report further described why the Endurance was actually three to four years away from production rather than the Endurance being on track to start production in September 2021, as was publicly represented on numerous occasions in the past by the Company. The report highlighted an interview with a former Lordstown employee "who was intimately familiar with the path toward production. They explained that Lordstown has built fewer than 10 prototypes so far, and that the company is still making extensive modifications." This former employee also detailed how in mid-January 2021, Lordstown "totally switched from a plastic exterior to aluminum" to order to lessen the weight of the Endurance. According to the former employee, this was a "drastic" change that would "essentially restart any testing and validation process."

181.    This former employee continued by describing how the Endurance had not completed any of its required testing and validation, including: "[c]old weather testing, which typically takes about 3 months and had not begun"; "[a] 'million mile' test or similar durability

test done by major automakers," which typically "requires 6 months of 24/7 testing"; or "[m]ajor

testing required for the Federal Motor Vehicle Safety Standards (FMVSS) by the NHTSA."

182.    Providing further support, the Hindenburg Report included the following quote

from a senior union leader who had worked for decades at the Lordstown plant for GM:

> *I know they're way behind.* If nothing else went wrong then Covid threw them way
> behind. They can't fire up the old machines. Some of them they can. But *everything
> else has to be reprogrammed and some of it has to be rebuilt. . . . It's not ready.
> It is not ready. They showed some stuff on TV in the body shop with the robots
> that do the welding. But if you never worked in a body shop you didn't realize
> they weren't working. They were moving but not welding. There were no sparks.*

(Emphasis added.)

183.    On this news, Lordstown's share price dropped $2.93 (or 16.5%) from its March

11, 2021 closing price of $17.71 to close at $14.78 on March 12, 2021.

### March 17, 2021 Press Release and Current Report

184.    On March 17, 2021, after the market closed, Lordstown issued a press release and

a Form 8-K filed with the SEC announcing financial results for the Q4 2020, reporting a net loss

of $101 million. In a call with investors conducted after the market closed, Defendant Burns

disclosed for the first time that the SEC had launched an investigation into the Company. He went

on to state that the Company's Board had assembled a special committee to conduct an internal

inquiry.

### March 18, 2021 CNBC Interview

185.    On March 18, 2021, before the market opened, Defendant Burns claimed during an

interview with *CNBC* that the Company had "*never said we had orders.*" (Emphasis added.) He

admitted that *Lordstown "[didn't] have a product yet" and that "[b]y definition we can't have

orders."* He further stated that the pre-orders were intended to "[g]auge interest." Despite his own

personal, repeated statements touting the number of preorders and describing how this meant

demand for the Endurance was high, Defendant Burns now stated: "Nobody knew if fleets would buy an electric pickup truck. It was completely unknown science, no data around it. . . . *I don't think anybody thought we had actual orders.* That's just not the nature of this business." (Emphasis added.) On this news, Lordstown's share price dropped $2.08 (or approximately 14%) to close at $13.01 per share on March 18, 2021.

***March 24, 2021 Hindenburg Research Photographs***

186.    On March 24, 2021, Hindenburg Research published some "behind the scenes" photographs, taken in the summer of 2020, of the Endurance truck after it had reportedly broken down and had to be towed while being filmed for an Endurance commercial, which aired days prior to the start of the Relevant Period.



Hindenburg Research
@HindenburgRes

NEW: We received behind-the-scenes photos from a shoot ahead of the July 2020 commercial for the $RIDE Endurance.

At the time, the company was 3 months from going public and claimed it would be delivering trucks to fleets "in early 2021".











An onlooker explained that the Endurance broke down on the road mid-shoot, with workers struggling to push it onto a truck before calling a tow truck.

The deal to take $RIDE public was announced on August 3rd, just 2 business days after the release of the commercial.

187.    On this news, Lordstown's share price dropped $1.21 (or approximately 10%) to close at $11.38 on March 24, 2021.

**Subsequent Events and Disclosures**

*June 14, 2021 Current Report and Press Release*

188.    On June 14, 2021, the Company announced on its Form 8-K filed with the SEC that Defendant Burns had resigned from his position as Chairman and CEO and that Defendant Rodriguez had also resigned from his position as CFO. It further announced that "Lead Independent Director Angela Strand has been appointed Executive Chairwoman of the Company, and will oversee the organization's transition until a permanent CEO is identified, and Becky Roof, will serve as interim Chief Financial Officer."

*June 14, 2021 Special Committee's Report*

189.    On June 14, 2021, the Company also reported the results of the investigation conducted by the Special Committee of its Board of Directors into the Hindenburg Report that was published on March 12, 2021. The Company admitted to the fact that its previous statements regarding pre-orders being obtained "primarily" from commercial fleets were inaccurate. Instead,

> [M]any pre-orders were obtained from (i) fleet management companies or other end users that indicated interest in purchasing Endurance trucks . . . and (ii) so-called 'influencers' or other potential strategic partners that committed to attempt to secure pre-orders from other entities but did not intend to purchase Endurance

trucks directly.

The Company further admitted that one purported purchaser of a large number of pre-orders "does not appear to have the resources to complete large purchases of trucks." Other purported purchasers "provided commitments that appear too vague or infirm to be appropriately included in the total number of pre-orders disclosed." On this news, Lordstown's share price dropped $2.15 (or 18.8%) to close at $9.26 on June 14, 2021.

### June 21, 2021 Wall Street Journal Article

190.    On June 21, 2021, the *Wall Street Journal* published an article entitled "Lordstown Motors Executives Sold Stock Ahead of Reporting Results and Before Troubles Came to Light" which reported that "five top executives, including the company's president and its former chief financial officer, sold more than $8 million in stock over three days in early February." Specifically, over the course of these three days in February, Defendant Schmidt sold "39% of his remaining vested equity for $4.6 million," Defendant Vo sold "99.3% of his remaining vested equity for $2.5 million," and "[t]hree other executives [*i.e*, Defendants Brown, Post, and Rodriguez], including the former CFO [Defendant Rodriguez], [sold] between roughly $250,000 and $400,000 of stock."

191.    Despite the Company claiming in the Special Committee's Report published on June 14, 2021 that the aforementioned stock sales were "'made for reasons unrelated to the performance of the company,'" the article noted that securities lawyers, accountants and analysts viewed the transactions as "highly unusual," particularly due to the fact that the transactions transpired "during a [blackout] period when many other publicly traded companies bar executives from selling shares."

192.    The article further stated that "[m]ost listed companies" implement this "so-called blackout [period]" as an intended measure to ward off the appearance of insider trading by preventing "business leaders from trading company stock outside of prearranged plans from some time around the end of a quarter to when results are released publicly." According to a 2020 survey conducted by Deloitte, "98% of companies reported having blackout periods prohibiting trades by top officers around quarterly disclosures."

193.    The decisions of five of the Individual Defendants to sell stock in early February 2021 ahead of the Form 10-K being filed with the SEC on March 25, 2021, when they possessed material non-public information and before the material misstatements and omissions were exposed, demonstrate the Individual Defendants' motive in facilitating and participating in the scheme to make or cause the Company to make false and misleading statements throughout the Relevant Period.

## DAMAGES TO LORDSTOWN

194.    As a direct and proximate result of the Individual Defendants' conduct, Lordstown has lost and expended, and will lose and expend, many millions of dollars.

195.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and certain of its current and former officers and directors, the investigation into the Company being conducted by the SEC, additional governmental investigations, any internal investigations, including the investigation conducted by the Special Committee into the Hindenburg Report, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

196.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

197.    As a direct and proximate result of the Individual Defendants' conduct, Lordstown

has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment and other violations of law.

## DERIVATIVE ALLEGATIONS

198.    Plaintiff brings this action derivatively and for the benefit of Lordstown to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Lordstown, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

199.    Lordstown is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

200.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Lordstown. Plaintiff will adequately and fairly represent the interests of Lordstown in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

201.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

202.    A pre-suit demand on the Board of Lordstown is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Strand, Hamamoto, Feldman, Reiss, Spencer, Gates, Kowitz, and Rucidlo (the "Directors"). Plaintiff needs only to allege demand futility as to four of these eight Directors.

203.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

204.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

205.    Additional reasons that demand on Defendant Strand is futile follow. Defendant Strand has served as a Company director since October 2020 and as the Executive Chairwoman of the Company since June 14, 2021. She also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As the Executive Chairwoman, Defendant Strand is a non-independent director. She benefited from the Proxy Statement, containing false and misleading statements, which led to her election to the Board and allowed her to breach her fiduciary duties to the Company. Moreover, she previously worked with Defendants Burns, Rodriguez and Rucidlo at another company founded by Defendant Burns: Workhorse. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls

over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Strand breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

206.    Additional reasons that demand on Defendant Hamamoto is futile follow. Defendant Hamamoto served as Chairman and CEO of DiamondPeak and as a Company director since October 2020. As Chairman and CEO of DiamondPeak. he oversaw negotiations with Legacy Lordstown in connection with the Merger. Defendant Hamamoto engaged in insider trading, selling one million shares of Lordstown common stock for proceeds of $16.38 million while the share price of Lordstown's common stock was artificially inflated. Furthermore, the Proxy Statement, which contained further false and misleading statements, was solicited on his behalf and led to his reelection to Board, allowing him to continue breaching his fiduciary duties. Moreover, Defendant Hamamoto is a defendant in one of the Securities Class Actions. For these reasons, Defendant Hamamoto breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterred, and thus demand upon him is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant Reiss is futile follow. Defendant Reis has served as a Company director since February 2020. She also serves as a member of the Audit Committee. Defendant Reiss has received and continues to receive significant compensation for her role as a director as described herein. She benefited from the Proxy Statement, containing false and misleading statements, which led to her election to the Board and allowed her to breach her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her

duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Reiss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208. Additional reasons that demand on Defendant Spencer is futile follow. Defendant Spencer has served as a Company director since February 2020. He also serves as a member of the Compensation Committee. Defendant Spencer has received and continues to receive significant compensation for his role as a director as described herein. He benefited from the Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Spencer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209. Additional reasons that demand on Defendant Feldman is futile follow. Defendant Feldman has served as a Company director since October 2020. He also serves as the Chair of the Audit Committee. Defendant Feldman has received and continues to receive significant compensation for his role as a director as described herein. He benefited from the Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets. For these reasons, Defendant Feldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Rucidlo is futile follow. Defendant Rucidlo has served as a Company director since October 2020. He also serves as a member of the Audit Committee. Defendant Rucidlo has received and continues to receive significant compensation for his role as a director as described herein. Moreover, he previously worked with Defendants Burns, Rodriguez and Strand at another company founded by Defendant Burns: Workhorse. He benefited from the Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rucidlo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Gates is futile follow. Defendant Gates has served as a Company director since October 2020. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Gates has received and continues to receive significant compensation for his role as a director as described herein. He benefited from the Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gates breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Kowitz is futile follow. Defendant Kowitz has served as a Company director since October 2020. He also serves as a member of the Compensation Committee. Defendant Kowitz has received and continues to receive significant compensation for his role as a director as described herein. He benefited from the Proxy Statement, containing false and misleading statements, which led to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kowitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Defendants Feldman, Reiss, and Rucidlo (the "Audit Committee Defendants") served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's internal accounting and financial controls, the Company's risk management and assessment pertaining to, *inter alia*, the financial, operational, accounting, and tax matters of the Company, including data privacy and security, the organization and performance of the Company's internal audit function, and the Company's

compliance with legal and regulatory requirements. The Audit Committee Defendants failed to fulfill these obligations, as they are charged to do under the Audit Committee Charter, allowing the Company to issue materially false and misleading statements to the public during the Relevant Period and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

214.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Hamamoto and Feldman have concurrently served on the board of directors and/or as managers of the same companies over the course of the past decade. Defendant Hamamoto served as Executive Chairman of NorthStar Asset Management Group while Defendant Feldman concurrently served as a managing director. Defendant Hamamoto and Defendant Feldman also had overlapping tenures at Colony Capital, Inc., and NorthStar Realty Finance Corp. Furthermore, Defendants Strand and Rucidlo worked together at Workhorse, where Defendant Burns was the founder, former CEO, and former CFO and where Defendant Rodriguez also worked in various executive capacities. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

215.    In violation of the Code of Conduct and the Audit Committee Charter, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement,

abuse of control, waste of corporate assets, violations of the Exchange Act, and the claims alleged in the Securities Class Actions. In violation of the Code of Conduct and the Audit Committee Charter, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

216.    Lordstown has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lordstown any part of the damages Lordstown suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

217.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

218.    The acts complained of herein constitute violations of fiduciary duties owed by Lordstown officers and directors, and these acts are incapable of ratification.

219.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the stockholders of Lordstown. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Lordstown, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

220. If there is no directors' and officers' liability insurance, then the Directors will not cause Lordstown to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

221. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Hamamoto, Hannaway, Hash, Richardson, and Walsh for Violations of Section 14(a) of the Exchange Act**

222. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

223. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

225.    Under the direction and watch of the Defendants Hamamoto, Hannaway, Hash, Richardson, and Walsh, the Proxy Statement failed to disclose, *inter alia*: (1) contrary to the Proxy Statement's description of DiamondPeak's Audit Committee's responsibilities, DiamondPeak's Audit Committee was not adequately exercising these functions, was causing or permitting DiamondPeak to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the 2020 Plan; and (3) contrary to the Proxy Statement's description regarding the risk oversight function of the Board upon closing of the Merger, the Board upon closing of the Merger would utterly fail in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties.

226.    Furthermore, under the direction of the Defendants Hamamoto, Hannaway, Hash, Richardson, and Walsh, the Proxy Statement failed to disclose, *inter alia*: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were

fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; (4) the Company is not and has not been "on track" to start production of Endurance in September 2021; (5) the Company misrepresented the development of its hub motor and battery technology; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

227.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to, approval of the Merger and the approval of the 2020 Plan, allowing the Individual Defendants to receive further unjust compensation.

228.    The false and misleading elements of the Proxy Statement also led to, *inter alia*, the election of Defendants Burns, Strand, Feldman, Gates, Hamamoto, Kowitz, Reiss, Rucidlo, and Spencer, which allowed them to breach their fiduciary duties to the Company.

229.    The Company was damaged as a result of Defendants Hamamoto, Hannaway, Hash, Richardson, and Walsh's material misrepresentations and omissions in the Proxy Statement.

230.    Plaintiff on behalf of Lordstown has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

231.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Lordstown. Not only is Lordstown now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Lordstown by the Individual Defendants.

233.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lordstown not misleading.

234.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Lordstown. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

235.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

236.     Plaintiff on behalf of Lordstown has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

237. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

238. The Individual Defendants, by virtue of their positions with Lordstown and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Lordstown and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Lordstown and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

239. Plaintiff on behalf of Lordstown has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

240. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

241. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lordstown's business and affairs.

242. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

243. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

rights and interests of Lordstown.

244.    In breach of their fiduciary duties owed to Lordstown, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's purported pre-orders were non-binding; (2) a significant number of purported pre-orders were fabricated and placed by individuals and companies without the financial means to purchase large orders of Endurance trucks; (3) Defendants paid a consulting group to artificially inflate the demand for Endurance pre-orders; (4) the Company is not and has not been "on track" to start production of Endurance in September 2021; (5) the Company misrepresented the development of its hub motor and battery technology; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

245.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

246.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

247.    Moreover, during the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in insider sales for proceeds in excess of $28 million.

248.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

249. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

250. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lordstown has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

251. Plaintiff on behalf of Lordstown has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

252. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

253. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lordstown.

254. The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received

bonuses, stock options, or similar compensation from Lordstown that was tied to the performance or artificially inflated valuation of Lordstown, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes compensation received under the 2020 Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

255. Plaintiff, as a shareholder and a representative of Lordstown, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

256. Plaintiff on behalf of Lordstown has no adequate remedy at law.

### SIXTH CLAIM

#### Against the Individual Defendants for Abuse of Control

257. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

258. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lordstown, for which they are legally responsible.

259. As a direct and proximate result of the Individual Defendants' abuse of control, Lordstown has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

260. Plaintiff on behalf of Lordstown has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

261.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

262.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lordstown in a manner consistent with the operations of a publicly-held corporation.

263.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lordstown has sustained and will continue to sustain significant damages.

264.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

265.    Plaintiff on behalf of Lordstown has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

266.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Lordstown to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

268.    As a result of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

269.    Plaintiff on behalf of Lordstown has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Burns, Brown, Fabian, Hamamoto, Hannaway, Hash, Post,
Richardson, Rodriguez, Schmidt, and Walsh for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

270.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

271.    Defendants Burns, Brown, Fabian, Hamamoto, Hannaway, Hash, Post, Richardson,

Rodriguez, Schmidt, and Walsh are each named as defendants in at least one, if not many, of the

Securities Class Actions, which variously assert claims under the federal securities laws for

violations of Sections 10(b), 14(a), 20(a), and 20A of the Exchange Act, as well as Rules 10b-5

and 14a-9 promulgated thereunder. If and when the Company is found liable in the Securities Class

Actions for these violations of the federal securities laws, the Company's liability will be in whole

or in part due to Defendants Burns', Brown's, Fabian's, Hamamoto's, Hannaway's, Hash's, Post's,

Richardson's, Rodriguez's, Schmidt's, and Walsh's willful and/or reckless violations of their

obligations as controlling shareholder, officers, and/or directors of Lordstown.

272.    Defendants Burns, Brown, Fabian, Hamamoto, Hannaway, Hash, Post, Richardson,

Rodriguez, Schmidt, and Walsh, because of their positions of control and authority as controlling

shareholder, officers, and/or directors of Lordstown, were able to and did, directly and/or

indirectly, exercise control over the business and corporate affairs of Lordstown, including the

wrongful acts complained of herein and in the Securities Class Actions.

273.    Accordingly, Defendants Burns, Brown, Fabian, Hamamoto, Hannaway, Hash,

Post, Richardson, Rodriguez, Schmidt, and Walsh are liable under 15 U.S.C. § 78j(b), which

creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C.

§ 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

274. As such, Lordstown is entitled to receive all appropriate contribution or indemnification from Defendants Burns, Brown, Fabian, Hamamoto, Hannaway, Hash, Post, Richardson, Rodriguez, Schmidt, and Walsh.

## PRAYER FOR RELIEF

275. FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Lordstown, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lordstown;

(c) Determining and awarding to Lordstown the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Lordstown and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lordstown and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

     2. a provision to permit the shareholders of Lordstown to nominate at least four candidates for election to the Board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)     Awarding Lordstown restitution from the Individual Defendants, and each of them;

     (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

                   */s/ David N. Truman*
                   One of the attorneys for Plaintiff

Dated: June 30, 2021                         Respectfully submitted,

                                             */s/David N. Truman*
                                             David N. Truman (0082347)
                                             david@ekrtlaw.com
                                             Stuart G. Torch (0079667)
                                             stuart@ekrtlaw.com
                                             Christina M. Royer (0073695)
                                             chris@ekrtlaw.com
                                             ELFVIN, KLINGSHIRN, ROYER & TORCH, LLC
                                             4700 Rockside Road, Suite 530
                                             Independence, Ohio 44131
                                             216.382.2500 (voice)
                                             216.381.0250 (facsimile)

                                             *Local Counsel for Plaintiff*

                                             **/s/Timothy Brown**
                                             **THE BROWN LAW FIRM, P.C.**
                                             Timothy Brown (New York Bar No. 4301495)
                                             767 Third Avenue, Suite 2501
                                             New York, NY 10017
                                             Tel: (516) 922-5427
                                             Fax: (516) 344-6204
                                             tbrown@thebrownlawfirm.net

                                             *PRO HAC VICE ADMISSION ANTICIPATED*
                                             *Lead Counsel for Plaintiff*